All right, we are ready.  You were in the courtroom when I made the earlier statements about Judge Hull's participation, right? You were in. Okay, good. You're on. Good morning, and may it please the Court. I'm Nicole Saharsky for the appellants, the previous owners of the Wells. This case involves a purely legal question, which is under the trust agreement, whether Beta can take out the money from the trust and give the government a surety bond instead. And the answer to that question is no, and it comes from within the four corners of the trust agreement. The trust agreement specifies the particular conditions in which money can come in and out. It says that it's originally funded with a $90 million U.S. Treasury note, not any other option, a $90 million U.S. Treasury note. And then it says that when other funds are put into the account, they have to be put into interest-bearing cash equivalents. Let me ask you a base starting question. Sure. Lots of lawyers, lots of ink. I take it that below and otherwise, neither side takes the view that there's any ambiguity at all. We're not dealing with the bankruptcy court, the district court. Nobody said this is ambiguous. In other words, that there's two reasonable ways to read all this language, the later agreements and all that, and if you get that, it's ambiguous and you need to go back below. Your view is the reading that you give us is the correct one and theirs is totally incorrect. So my question is, within all this, am I right that no one is asserting ambiguity in the calculus of our decision? It's for us to decide whether it says what it says or it doesn't, is that right? Yes, except we assert that there would be, as a backup argument, that if you found ambiguity, the correct thing to do would be remand, because the courts below found that it was unambiguous in Beda's favor. So either you could find that it's unambiguous in our favor or our backup position would be a remand. But I'd like... You must be a lawyer. Well, I just want to be accurate, Your Honor, and the accurate answer is we think it's unambiguous, but if you think there's ambiguity, a remand would be appropriate, but... I was just asking. I just wanted to make sure I read it correctly, that ambiguity was not at the top of the surface of arguments being made, but instead it's looking at the agreement and moving here and there and it's just pick the right answer and move on. But I got you. Yes. I didn't mean to derail you from your presentation. No, it's exactly where I wanted to start, which is with the language of the agreement. All right. Because we think that... So this is within the four corners of the trust agreement. I want to talk about the provisions that we think make it unambiguous in our favor. And this starts with what can be put into the trust, the $90 million that's originally put into the trust, and then any other funds which have to be put into interest-bearing cash equivalents. That's in the preamble to the trust, which says the $90 million. That's on page Record Excerpts 41. That defines the $90 million note. Then on Record Excerpts 43, it says in Section 2.2 that you put the $90 million in the account, and then 2.4b says you keep the $90 million in the account, and all other trust funds have to be in interest-bearing cash equivalents. I mean, this thing says money, the funds, payments, money, the whole way through, but those, I think, are the starting point in terms of the money that comes into the account. And then the second point, which we think is important, is that the trust is very clear about when money can come out of the account. This is in Section 2.4a. This is on Record Excerpts 43. We rely on this, obviously, in our brief. It says that the settler can't withdraw or transfer money except as expressly provided in the account. So you've got to... In the trust agreement. So you have to find something in the trust agreement that allows that. And there's just nothing that allows them to take out money and put a surety bond in instead. There are provisions that allow money to be taken out when the decommissioning is happening. Those are the Sections 4.2 and 4.3 that are in the next part of the agreement, which is disbursements. It says when you're doing the decommissioning, they can provide a certificate saying they're doing the decommissioning, and then get paid money with the written concurrence of us and the government. But there's no decommissioning now. All right. Help me out. Yep. Because you all have been with this longer than I have, and maybe I'm missing something. The bankruptcy judge determined, contrary to what you're saying, that the terms clearly allow what happened. The district court affirmed, but, as I recall it, for different reasons, so to speak. The district court said these terms are broad enough to encompass what transpired. I'm oversimplifying. But it's just the bankruptcy court says the language here allows it. The district court affirmed, but for different reasons, says the terminology is broad enough to allow it. And so I want you to tell me, and you're looking at the same language, so tell me how they detoured, derailed, got confused. Sure. So I'll start with the bankruptcy court. The bankruptcy court framed the question as to whether we, the previous owners, had a right to take any money out of the trust. But that didn't ask the preliminary question whether Beda had a right to take any money in the first place. The veto was not the right question to ask. And section 2.4 says that it has to be expressly provided that they have a right to take the money out of the account. Now the district court realized that the bankruptcy court made this error. And the district court said that in the opinion. This idea about the veto was wrong because you've got to find something in the trust agreement that expressly authorizes it. So the district courts found, tried to find a provision to uphold the bankruptcy court's reasoning. And it looked to two different provisions. The first, and one has to do with what comes into the account, and one has to do with what comes out of the account. Because you would need both, right? You would need something that allows a surety bond to come in, and you would need something to allow the money to be taken out. So the bankruptcy court, or I'm sorry, the district court first looked to the definition of trust funds. This is in section 1.2 of the agreement on record excerpts 42. And it says that trust funds shall mean the trust account, the supplemental bond, treasury note, that's the 90 million, and all other funds that are from time to time deposited into the account. And then it has some language about interest and other property and certificates and instruments. But all of that is in the context of funds. So the district court, without, with only a couple of lines of analysis, not really going into this language, said, I could fit a surety bond into trust funds because it says something about certificates and instruments and documents. But it only says that in the context of funds. Everything has to be funds to be put into the trust funds, meaning money. And we know this because section 2.4b, which is on the next page, says that all the trust funds have to be invested in interest-bearing cash equivalents. Wasn't that a reference to a surety bond? There's no reference to surety bonds, like nowhere in the trust agreement or the amendment to it. There is never, ever any reference to surety bonds. But weren't they initially put in? They initially put in a U.S. treasury note. So it had a principal of $90 million. It had a fixed rate of interest. And you could look in the account, and we actually got account statements that would tell you at every point in time what the money was, the money equivalent in the trust. And that, I want to answer the rest of why the district court was wrong, but just because I think this is a really important point. A surety note is not a financial instrument. It's not something readily convertible, a surety bond. It's not readily convertible to cash. It's an IOU. And it's only a secondary IOU. Wouldn't that be similar to a performance bond? It is a performance bond. Right. And what it's saying... Are performance bonds allowed? Performance bonds are not allowed under the trust agreement. It never says performance bond, surety bond, anything. Now there was a prior, there was the purchase, and let me just describe the history here because I think it's important. There was a purchase and sale agreement where the parties, the old and new owners, agreed to sell the wells. And they did not yet have the government's approval. And they needed the government's approval. And one of the things that the government does is figure out, like, how much money it's going to cost to do the decommissioning, and how the decommissioning liability is going to be satisfied. And so that was not addressed in the purchase and sale agreement, which did list various options but did not finally determine how the decommissioning was going to be satisfied. That was in the trust agreement. The trust agreement nowhere, nowhere says surety bond, performance bond, anything like that. It's all about money. You put in money. You put in the note that $90 million, that it grows to a certain amount. And then it was amended when there was a sale to a new owner in 2009, 2010. And there was a specific schedule of payments that more money had to be put in because the government regulator had decided that the decommissioning was going to cost even more. So once the parties decided on the trust agreement, it was all about money. We put the money in the trust so that Beda couldn't get it. You're referring to money as cash? Yes. The treasury note, which was eventually converted to cash and additional cash. And so, I'm afraid I've gone a little bit away from the district court's reasoning, but I want to make sure that I got . . . I mean, obviously, you know, we've got a de novo, so the reasoning . . . I mean, the appeal is from the judgment, not the reason, but just wanted to take you through those two, since we had two different courts below to deal with it, and we'll have to decide it. But let me ask you further to that end. I mean, I'm oversimplifying, but it's just like to me, the government's in the driver's seat in terms of what can happen, et cetera, et cetera. So you know, the government could and did define, you know, what securities, et cetera. So why is the previous owners who were removed from this sort of . . . I know you say it's not veto power, but it looks like the government is the one who could determine, you know, what is appropriate to fulfill the obligations, and so they approved allowing the performance bonds, which, as you acknowledged to Judge Clement, you know, is a security and insulates the risk that's sought. So why do the previous owners . . . or I guess I'm saying the government is not in here objecting that what happened shouldn't have happened. It's the previous owners who are in here objecting. So if the government is the prime driver on the sequence of events, they took the view that allowing the securities or performance bond was sufficient. I mean, is that of no moment? It doesn't matter because they agreed to the trust agreement. The reason that we entered into a written trust agreement was so it wouldn't be up for the government to just decide whenever the time came. The government was a party to the trust agreement. It signed it. It agreed to it. And its rights are only . . . the rights that it has are only the particular rights under the agreement. But the whole object, as I understand it, is that there are sufficient funds that when the decommissioning occurs, et cetera, et cetera, there's enough money to take care of that. Again, I'm oversimplifying, but at least that's the way I understood it. That was the whole point of it. So if the government is satisfied, who's the one looking over this, that the performance bonds, et cetera, satisfy that objective, that there's funds sufficient for that, and if in a broad reading of the terms it's reading, performance bond, not just cash only, is allowed, what's wrong with that reading? Because the government's not the only player here. We remain . . . we, the previous owners, remain jointly and severally liable, which is why rather than just leaving it up to the government, we entered into this trust agreement where the government is a party and where we have particular rights. It says that the entire agreement about decommissioning, this is Section 5.8, says that our whole agreement is within the four corners of that trust agreement. And everyone agreed to be bound by it, including the government. And it gives us rights that we have to approve before money is let out of the account. And there's a reason why performance bonds were not good enough for us. We have seen real world examples of where sureties have gone bankrupt, where sureties have refused to pay, where they've . . . But we're deciding one case, not policy. The parties here, sophisticated as an understatement, could have written in under no circumstances saying anything but cash, green money, deal out, nothing else. That wasn't put in here. Well, with respect . . . And that could have been the case. The amicus brief in your argument, Armageddon, if performance bonds or something are allowed. So we're deciding this case, the language used here, not, you know, what may happen in the industry. So my point is, I get you, but obviously you could put in writing that says under no circumstances shall anything other than cash be here. And that's not put here. Well, with respect, Your Honor, I think when you look at all of the language, it consistently refers to specific dollar amounts, to payments, to interest-bearing cash equivalents. It doesn't say performance bond or surety bond anywhere. And if you wanted to go . . . I'm not going to say no either. If you . . . Well, let me just suggest one other thing, which is that if you wanted to go the surety bond, you would never have entered into the trust agreement in the first place. The whole point of the trust agreement was to take money and put it in an account at U.S. Bank so that Beda could not get to it except under the decommissioning circumstances. And so there's no surety bond in here. There's no performance bond in here. And if you look at it, it says over and over that it has to be payments. And I think the party's course of conduct in 2009 and 2010 confirms that. And I'd just like to address that briefly. And so this is when the wells were resold to Beda, and there was . . . the government decided that more money needed to be put in the account because the original liability amount was not enough. And so the parties entered into the trust amendment, and there was a particular schedule of money that they agreed to be put into the account. And that schedule was actually followed from 2010 to 2016. Everyone understood that money had to be put into the account. And the problem really at the end of the day with the other side's view is that it doesn't make any sense. Why would we have entered into this very complicated trust agreement if the next day they could have just turned around and said, we're taking out all the money, and we're just going to give the government a surety bond, which has risks that cash doesn't have? That's their position. They've removed $152 million from the account. Their position is that they can go ahead and drain the account the next day. And there's just no way that you would have written a trust account, which is for keeping the money safe, if that were the case. All right. Tell me the specific . . . I think you said 2.4B. Madam Clerk, give her two minutes on the clock. We asked a lot of questions, and the other side, I have a feeling, is going to come up and say something different. But hone me in, and this is the last case, so this is for Judge Hoh's benefit, as well as mine. You started on 2.4 of the agreement, so that's where you're hanging your hat? Well, I think there are several provisions of the agreement, and I would just like to walk the Court through them, because I think they show that actually the whole agreement is all about money. But I will be brief within the two minutes. So if we start at the beginning of the agreement, it defines the initial money that's put in the account. This is on Record Excerpt 41, as the $90 million Treasury note. And it says that it's going to be held in trust. It defines trust funds as funds, meaning, in our view, money. Article 2 talks about how the trust works. It gives, like, all the basics of how the trust works. It says in Section 2.2, the $90 million is put in the account. And then in 2.4, which we've talked quite a bit about, what do you do with that money? 2.4a, which is the primary part on which we rely, says, except as expressly provided, the trustee shall not permit the settler, Beta, to withdraw or transfer any of the trust funds from the trust account. And that's what the District Court said, is that there needs to be an expressed authorization for them to take the money out of the account. And you can't find one in this trust agreement. And then 2.4b, which is the other part that we talked about, is what makes it clear that it has to be money. It says that the $90 million shall remain invested in such form in accordance with the terms thereof. The $90 million has to stay there in the trust. And then it says, the settler and beneficiary direct the trustee to invest all other trust funds in interest-bearing cash equivalents. I'm not sure, you know, how it could be more clear that it has to be money. All trust funds have to be put in interest-bearing cash equivalents, not IOUs or insurance policies or whatever else. Interest-bearing cash equivalents. And then the amendment, which happened around 2009-2010, this was the schedule of money that I was talking about, I think makes this crystal clear. It says, I'm on record excerpt 60, this is revised 2.2a, it says, the amount of liability has been increased to $152 million. The beta shall deposit additional payments at a minimum of $1.25 million per quarter. And then there's a schedule of where the dollar amount has to be every quarter from, or I'm sorry, at the end of every June from 2011 to 2016. I'm going to stop you there at the end of the two, because you've got your rebuttal time to come up. That's fine. Thank you, Your Honor. You know, we absolutely love when lawyers say things are, quote, crystal clear, close quote. Thank you. All right. Thank you. You've got your rebuttal time. All right, Mr. Adams. You can give him the two, Madam Clerk. I want to be even-handed with it. He may not need it, but at any event. All right, Mr. Adams, why do I think you're going to say something different? Good morning, Your Honor. William Adams for Beta Operating Company. May it please the Court. BOEM is the expert federal agency in this area and the trust beneficiary here. It recognizes that performance bonds are low-risk, efficient, and the standard means of securing decommissioning obligations. Were they ever put in the trust account? The performance bonds were given to the government. But were they ever put in the trust account to increase the amount of funds in the trust, the specific trust account that you named in the papers? Our position is that they are in the trust account. The record does not reflect that they were given to the trustee. But our position is that they are in the trust account.  This is not a breach of contract action. This is an action to determine whether the previous owner's rights are impaired by the bankruptcy plan. That seems sort of slippery. I mean, you're — can you represent to the Court that they were put in the specific trust account? Is that contested by the opposing counsel? The opposing counsel takes the view that the trust account is like a safety deposit box, that you put something in, all these documents are in there. That is not the conception, our understanding, of the trust account. The trust account — Specific numbered account. It is a specific numbered account. It has a reference number. It's for reporting purposes. U.S. Bank, as trustee, did assign a number to that account. It is our position that the bonds are part of the res of the trust. They're intended to be in the trust account. If they are not in the trust account, that is because — that is perhaps an issue for U.S. Bank, that they haven't — that they haven't properly accounted for them or properly fulfilled their reporting obligations. They are the res of the trust. They're part of trust — they're within the definition of trust funds under 1.2. But I can't say — You don't know that they're in that account. I don't accept the position that the account is some box or some document where you would actually put the bonds. So I think that the trust account is like — a trust is a legal fiction, Your Honor. And this is just like any other trust, you know, doesn't have a particular place that the trustee is holding on to the funds or is holding on to particular things that are in the account. So I can't — But it doesn't have to be put in the trust account. That's different than a trust. It does have to be deposited into the — deposited into the trust account. I agree — I agree with Your Honor. And I can't — I cannot represent to the Court — I don't know that it's true or that the record does not reflect whether it's actually in. But again, I don't think that's the question for the Court at this stage. I think the question is, could it be under the terms of the contract, under the terms of the trust agreement, could the performance bond be deposited into the trust fund, therefore raising the balance of the trust account, therefore raising the balance of the account so there can be a disbursement? I think under the language, it's unambiguously clear that it could be. And the reason for that is, in Section 1.2 of the trust agreement, the parties define trust funds incredibly broadly, not — there's no reference and no limitation for trust funds being cash. My friend on the other side said this agreement has money written all over it, essentially. But money's not referenced in the trust agreement. It says trust funds are defined to include several varieties of collateral, including other property, certificates, and documents. Performance bonds certainly fit into those categories. If the parties had wanted to limit this to a cash or a cash-equivalent trust agreement, they could have easily said so, as Judge Stewart said. But in fact, they have a very broad definition. It's true that the initial funding of the trust account was with a $90 million Treasury note. I would note that that's actually not cash itself. A Treasury note is a government-issued security. So we know from the outset that they didn't view this as a cash, money-only trust account. Now, the other provision that I heard a lot about was 2.4b. 2.4b is not a substitute definition for trust funds. So we have a very broad provision, doesn't mention cash, includes documents like performance bonds. 2.4b directs the trustee to invest trust funds in interest-bearing accounts. But you have to read that provision with the broad definition of trust funds, harmonizing them as California law requires. And that harmonization shows that where a document—I'm sorry, where funds are capable of being invested in an interest-bearing account, that shall occur. But it doesn't prohibit or in any way undermine or gut the very broad definition, as the District Court recognized, of trust funds in 1.2. Another reason that this is confirmed is that at the contemporaneous agreement, we talked The Court has heard a lot of argument about the trust agreement and the trust agreement only. There's also the contemporaneous agreement in which the previous owners are actually a party. You'll know that the previous owners are not a party to the trust agreement. Beta is the settler, and the BOEM is the beneficiary. But when the previous owners actually entered into a contract, they entered into a contract that makes clear in Section 9.03L—that's at page 114 of the record—that the funds can be deposited into the trust, and those funds include bonds. That's the definition of government bonds includes performance bonds. So the previous owners, from the get-go, never said cash and never limited it to cash. The second piece of the puzzle is, if cash can be part of the res of the trust, if the conclusion of performance bonds could be part of the res of the trust, did the inclusion of those here allow the disbursement? The District Court was absolutely correct to find that authority in 2.2e of the trust agreement. That provision comes in at the amendment. So 2.2e says that where the trust is overfunded, where there's more than sufficient amounts that are in the trust for the decommissioning obligations, where that occurs, then BOEM may direct the disbursement of the excess funds. But doesn't that funding have to be in the trust account? It does need to be in the trust account, and again, it's our vision that it could be in the trust account here, given the definition. At minimum, I'll accept arguendo that it's not in the trust account. I don't know that to be the case. But if it's not, that's simply a ministerial action that—obviously, the performance bonds exist. The performance bonds have been accepted by BOEM, the expert federal agency here. And if they haven't been given to the trustee, they simply could very easily incur any sort of issue. So there's not a fundamental contractual-based problem here. And that's why you have to look again at the context of this. This is arising in the context of confirmation of a bankruptcy plan. If the trust agreement, as amended, permits the bonds for cash substitution, that means that the previous owner's rights are not impaired by the bankruptcy plan. And if they're not impaired by the bankruptcy plan, you should affirm the district court's judgment. Now, if—the way that—the only way that the previous owners can win is to show that the trust agreement prohibits, one, performance bonds ever being part of the trust, and two, the disbursement of excess collateral once those performance bonds are put into the trust. We have to step back— You've already taken the cash. Exactly. We have taken the cash out, Your Honor, because BOEM directed the trustee to release those funds because BOEM recognizes that surety bonds are low—that performance bonds are low-risk, efficient, standard means of bonding. Now— The account is deficient. The account is not deficient, Your Honor, because we think that the performance bonds, of which are for $152 million, which is the decommissioning amount—the amount of decommissioning obligations—are in the trust account. BOEM gave those—if you look at page 1848 in the Record on Appeal, BOEM treated the performance bonds as replacement security, and they gave—and they ascribed it a cash value. And so they recognize that these performance bonds are a substitute, a replacement, for the $152 million that was in the trust account, and therefore authorized its disbursement. And we know that the previous owners were okay with this— If the performance bonds were cashed in or called in or whatever, would they have $152 million worth of value? Yes, Your Honor. The performance bonds are essentially a guarantee. They're a contractual obligation to pay. And so the sureties here are on the hook—if Beda does not fulfill its obligations in the first instance—are on the hook for $152 million to fulfill the decommissioning obligations. That depends on the worthiness of the person or entity required to perform, right? That's correct, Your Honor. I'll say it another way. I keep coming back to this notion, as Judge Clement understood it, about an account. And if part of our exercise is to view the documents and what were the parties' intent, then it was put in an account. So you don't like the construct of this safety box. But if it's in an account, and the agreement was to have a treasury certificate, while that's not cash, it's deemed to be the next best thing. So what's wrong with interpreting the parties' intent that the cash equivalent, a treasury certificate, as opposed to some kind of guarantee, was what the parties really meant? Do you follow my question? Sure. Well, I'll start by saying, you know, BOEM has done its job on the front end to make Obviously, in the briefing, they found a couple of examples where surety obligations, not in the oil and gas context, but surety obligations have not been fulfilled. But BOEM, by regulation, has done its diligence and ensured that there's a robust, very solid bonding program, which requires that the bonds be non-cancellable. So one of their concerns was, well, if we stop paying the premium, then the bond might go away. Well, they're non-cancellable. They can't get off the hook just because we stop paying our premium. And they have to be—and the sureties have to be Treasury Department-approved ex-ante. So here we have A-rated sureties who have issued bonds that are non-cancellable and that must be payable upon demand by BOEM. And BOEM, in that circumstance, recognizes that performance bonds are, at the very least, on equal footing. This is not my word. This is the previous owner's word, that performance bonds are on equal footing with U.S. Treasury notes or cash. The risk— What's the best case that says that in the context of what we're dealing with? I don't have a case, Your Honor, that says that, but I would point you to the regulations. The regulations, these are all in 30 CFR, and if you look at 30 CFR 902A, B, and D, that is where the BOEM sets forth the requirements for the sureties and the surety bonds. And we know that the bonds here satisfied that requirement because BOEM accepted them as the replacement security. And BOEM—and we know that that's okay not only with BOEM, who is the beneficiary, the ultimate beneficiary of the policy, but that's okay in the previous owners because if you look at Record Excerpt 125, this is Section 1109H of the PSAs, there the previous owners agreed to accept a security interest in any government bond that Beda posted plus, quote, any substitute or replacement security, unquote. Here, the performance bonds are the replacement security that provide the previous owners with the full protection that they seek and that BOEM has said that they have. There's nothing in the agreement that requires cash. They don't expressly say performance bonds, but they certainly include categories that of which performance bonds are, and that's consistent with BOEM's preference and practice for using performance bonds. And— Let me ask you. So the money has already been taken out and given to them, right? Correct. Correct. Beda is using those funds. All right. So in the Zoom argue window, we agree with the other side. What happens? Exactly. Well, first, we don't think you can fully agree. At the very least, this would be ambiguous. We don't think it's ambiguous, but at the very least, it's certainly not unambiguous in their favor. So we would say you would remand on the contract interpretation, but let's say you outright reverse on the contract interpretation. You would still need to remand because Beda offered other reasons that the bankruptcy plan was permissible and should be confirmed in this part. In particular, under 11 U.S.C. 1129B, Beda's position is that even if the previous owners are impaired, that the plan still provides for the indubitable equivalent—that's the statutory term—indubitable equivalent of their rights under the contract. So at the very least, if you say—if you were to reverse on contract—on the contract interpretation, it would go back to the bankruptcy court to essentially determine whether surety bonds and performance bonds are the indubitable equivalent of, you know, U.S. Treasury notes or cash. We think the bankruptcy court would have no difficulty reaching that issue given the—given BOEM's statutory—regulatory scheme and the protections that are in the bonds here, but that's what you do. You need to remand for consideration of those further—of those further issues. Well, the money is gone, so any way it would play out at the end, if it ended back there, there would be no order of anybody to put money back in there, right? Correct. There's no— It's just a done deal. There's—I would—yeah, there's no counterclaim—claim for affirmative relief going the other direction. So if the bankruptcy court were ultimately—at the end of the day, and we don't think this would ever happen—to, you know, reject all of our arguments, there's no claim to put the money back in the trust. The performance bonds will still be there, and they'll still be providing all the protections that the previous owners are entitled to under the contract. But if there would be a finding that the performance bonds were not equivalent to the safety of the cash that you took out, would you be in a position to cash out the performance bonds and put the cash back in the trust account? There are—I would say there are also other—other arguments that we have in the bankruptcy court, not just the indubitable equivalent argument, but if your Honor's question is if, say, we lost across the board, I think there would have to be an affirmative claim for breach of contract, and we would—and they would have to show, again, damages. We don't—we think that—and Bohm thinks, certainly, that the previous owners are fully protected. Their—their obligations are fully protected by the surety bonds, and so—and those are going to be in the trust regardless of the—of the rulings here. And so, ultimately, it would be a breach of contract action. They'd have to show—they'd have to show damages, I think, to be able to get the funds back into the—back into the trust. But, you know, the—you know, one of the reasons that Bohm likes just, you know, surety bonds as a practical matter is it does allow companies to not have this money tied up, you know, sitting in a trust account. It can be used for other corporate and economic development purposes. And so, you know, that's what—that's what BEDA has done here. It has been able to fund several capital expenditures, including projects that will increase domestic and offshore oil production. So it's actively using those funds, but—and it would require a, you know, a breach of contract action, I believe, to require those to go—to go back into—to go back into the trust. But ultimately, it comes down, I think, to the fact that Bohm, you know, as Judge Stewart said, you know, Bohm is really in the driver's seat here with respect to the trust agreement. It is the ultimate beneficiary. They're not objecting. They, in fact, ascribed a cash value to this, treated the performance bonds as replacement securities, which is something that the previous owners expressly contemplated in contemporaneous agreements. And the purpose of the trust was to—ultimately, at bottom, was to secure the decommissioning obligations. And the performance bonds from A-rated securities and non-cancellable contracts that are payable upon demand provide the protection that the previous owners sought and that the previous—and they will receive should BEDA not perform its obligations. The risk here is just—is incredibly small, and that's how—and that's what Bohm recognizes that—while Bohm recognizes that performance obligations—sorry, performance bonds are the standard way to secure decommissioning—to secure decommissioning obligations. I think this is one that has recently—in there, there's an amicus brief in this case, right? Yes, on both sides. Way back when, when I read it, it made it seem like the sky was falling in order to sort of allow this. And so, I'm not saying whether that's true or not, but again, trying to stay within the confines of what we have in front of us, as opposed to these policy arguments. But that was the reason why I asked you, what's your best case, because I'm like, well, if this is so kind of tried and true, surely there's a case that's discussing the treasury securities, blah, blah, blah, but you cite me back to the agreement, so to speak. So, I mean, is this sort of normative in terms of case law? I'm going to tell my policy. Right. Well, I would cite you back to the regs, not just— You said the regs. Not just to the contract, which shows sort of the normalcy—I mean, we're not seeking anything, and the BOEM didn't order anything that was irregular. The standard default method of securing the decommissioning obligations is through performance bonds. And, you know, I'm frankly not aware, and I don't mean to testify, and it says not in the record, I'm not aware of similar, you know, agreements like this where they require a party to tie up $152 million for 30 to 50 years to just have that sitting there. BOEM recognizes that performance bonds are on equal footing—their words, not mine—with cash or cash equivalents. Let me bring you back, since you're running out. As you mentioned, this is not a breach of contract action. This is arising in the course of the bankruptcy, so if you win—well, let me ask a different—what's the status of the bankruptcy? Is it closed out? It's closed out. The plan was confirmed, and there was an objection to this piece, which was preserved, and so this is sort of a—I don't know if ancillary is the right word, but it's the last bankruptcy-related proceeding that's ongoing. Yeah, yeah, yeah. Presuming Judge Stewart agrees, I would like to just tie up this loose end and ask you to file a 28-J letter by Monday, next Monday, stating whether the performance bonds are in the trust account number 104-821-002. Okay. Thank you. All right. Thank you, Your Honor. All right. Thank you. All right. Mr. Huskey, you've got me both. So here's the thing. This is a contract case. The question is the interpretation of the trust agreement. The problem with pretty much everything Beda said today is that it acts as though the agreement never existed, that we're just discussing in the abstract, could the government have agreed to a surety bond? Would that be okay? What would the risk be? Et cetera. But the reason that we entered into this trust agreement, which the government signed, was because we weren't willing to rely on surety bonds. We wanted the cash to be put in a trust account. Put that in there and say that. I mean, that's why I come back to you. You know, we regularly deal with three judges trying to tell lawyers what they meant to do when they were doing this. And so we're interpreting language. And so one argument is to say, if it was clear as what you said, language could have been put in there expressly saying, cash only, blah, blah, blah. That's not there. I mean, we get that a lot. So the flip is that if it wasn't expressly forbidden, and we're trying to figure out what the party's intent, and everybody says it's not ambiguous. So I think I get the question. Two answers. First answer, we think that this is replete with references to cash, and I gave you some of them. But I'm sure the court will want to go back and look at them. But second, the question is, is it expressly forbidden? The answer is yes. There's two parts that expressly forbid what Beda wants to do. The first is, what has to be put into the account? The definition of trust funds? It has to be funds. I know you'll want to go back and look at the definition, but the long and short of it is, it has to be funds. And we know that because every time that money was put in, it was money other than the $90 million Treasury note, which has an immediate money value. The second reason that it's forbidden is because Section 2.4a says, unless it's expressly provided, you can't take the money out. And the part that they rely on for taking the money out, Section 2.2e, says that if the amount of money in the account goes above the liability amount, which is $152 million, that the trustee on a quarterly basis would pay Beda the excess. This isn't a checking account for Beda to put money in and take money out. It's an excess if the amount in the account is over the $152 million. You can call U.S. Bank. Well, I mean, I wouldn't call U.S. Bank. But if one called U.S. Bank, there is a number bank account, and $152 million is gone. Nothing was put in to make it over $152 million. It's at, as I understand it, about $200,000 right now. Surety bond is just an IOU. You can't immediately cash it in. A surety is when Beda is supposed to pay to do the decommissioning. And if Beda doesn't pay to do the decommissioning, the surety will do it up to the amount of $152 million. The view, as I think was asked earlier, that it's basically a performance bond. I mean, I guess something slightly better than a surety bond, but a guarantee of sorts to where it's as good as the cash equivalent? Well, that's why we didn't agree to it in the trust agreement, because it's not as good as cash. And we saw examples, real-world examples, including with one of the sureties that Beda provided in this case, where they refused to pay. It came time to pay, and they said, we want additional collateral. This is for a pipeline off the coast of California, just like where our wells are. And there have been disputes about coverage that we've seen. And they've gotten litigated. So the surety doesn't always pay. And that's why we weren't willing to agree to it. And that's why we entered into this trust agreement. And you know, at the end of the day, the real problem with Beda's position is it just doesn't make sense. Like, why would we have entered into this trust agreement and required the money to be put in, especially on this special schedule, to get to the $152 million? Coming back to the question, as stated, this is not a breach of contract action. We're getting it in the context of a bankruptcy. I mean, if we were here on breach of contract, that might be a different set of arguments. But it is within the context of bankruptcy. And as I ask you, I ask counsel opposite, right now the bankruptcy is closed. So this is a residual piece. You agree with that? Right. The only feature of the bankruptcy that's open is a contract interpretation. There aren't any bankruptcy issues here. We never made a claim against the bankruptcy estate. We're not a claimant. The only reason that we appeared in the bankruptcy proceeding was because Beda proposed getting the money out of the trust. And we said, wait, wait, wait. We have a contract. You can't do that. But we're not claimants. And we don't, these questions that were raised by Beda about whether we could get some kind of substitute indubitable equivalent for our claim, we never filed a claim. We're not a claimant. We're not claiming rights because we appeared in the bankruptcy. We're claiming rights under the contract. So with respect, it is a contract case. If the appellees prevail on this appeal, let's assume for the sake of our discussion, if we affirm the bankruptcy proceeding is closed, so where does that leave your clients? I mean, where does that leave things? It's just the performance bonds are there, and it's just a matter of if or when the decommissioning occurs, whether there's a cash equivalent to satisfy that? I guess that's right. It leaves us in a terrible position because that's not what we bargained for. We entered into the trust agreement because we didn't want to be in that position, and the government agreed to that. And I understand that you have questions about, oh, the government allowed these bonds to be issued, et cetera, et cetera. But the government was a party to the trust agreement, and its rights were set out under the trust agreement about exactly what could happen. And it says that the only times that the money can be let out is when both the government and us, the previous owners, agree in writing that the money is let out of the account. That's in sections 4.2 and section 3. So I understand that you've asked these questions about, you know, couldn't the government approve acts, et cetera, et cetera. But the point is what the government actually agreed to is the trust agreement. And the real problem at the end of the day is that BEDA just doesn't give any effect to the trust agreement. Why would we have done it if they could turn around tomorrow, take out all the money? Final question, given that nobody's asserting ambiguity, what's the best case you rely on, not the regulation, what's the best case you rely on for the proposition that, you know, this is a defined specific account, and what occurred here is forbidden? Any case that helps us that you rely on? I would point the court to the language of the agreement, but then I would also point the court to the cases cited on pages 11 and 33 of our brief, which explain, which set out some of the problems with surety bonds and why we didn't agree to them. But at the end of the day, you know, there is, there are cases cited in the briefs that have to do with using basic contract law principles, but everyone agreed, you know, this is a contract case. That's amazing. You know, neither side has kind of a best case to rely on. I ask him the same question. What's your best case? He cites me to the regulation. I'm asking here. I mean, yeah, there are cases that talk to us about contract interpretation, etc., and, you know, it seemed to be, given all this, that there would be case or cases, whether the Fifth Circuit or otherwise, dealing with this treasury securities performance bond in the context of decommissioning and all that, because this is a pretty big industry and a lot, you know, going on, and we're not trying to decide it as an advisory opinion or whatever. So, if there is a best . . . I mean, we'll read the brief. If you say it's in the brief, we've read them, we'll look at it again. Well, I can actually give you the citations. I just opened it to page 33 of our brief. There's the Vinoco case, which is the exact surety that they suggested should be used here, refusing to pay. There's the Palm Energy Group. There's the INRI liquidation of Integrity Insurance Company. I was just trying to make it easier by saying that they were on page 33 of our brief. Look, I mean, I understand that this is . . . there are a lot of different contract provisions, etc., but at the end of the day, this is a contract case, and I would urge the Court to read the contract carefully, because we just didn't agree to what Beda claims. All right. Thank you much. Thank you, counsel. Besides an interesting case, but we'll figure it out, and we'll . . . and you have the director from the court to file the letter, please. All right. Thank you. That concludes the Orly Ardent cases for today. The panel will be in recess until 9 a.m. tomorrow. Thank you.